IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ROBERT PECK, JR.,<br><br>                    Petitioner,<br><br>         vs.<br><br>JOE A. LIZARRAGA, Warden, Mule Creek State Prison,[1]<br><br>                    Respondent. | No. 2:13-cv-01265-JKS<br><br>MEMORANDUM DECISION |

Robert Charles Peck, Jr., a state prisoner proceeding *pro se*, filed a Petition for Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Peck is currently in the custody of

the California Department of Corrections and Rehabilitation and is incarcerated at Mule Creek

State Prison.  Respondent has answered, and Peck has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

In resolving his claims on direct appeal, the Court of Appeal recounted the facts of this

case as follows:

> At the time of the incident, [Peck] and the victim lived together in a dating
> relationship.  [Peck], who was a truck driver, got into an argument with the victim while
> returning from a trip to Southern California.  When they got home, the victim told [Peck]
> she was leaving, and she began packing her things.  [Peck] left on another job, and the
> victim went to sleep.  When [Peck] returned sometime later, he jumped on top of the
> victim and began wrapping duct tape around her head, covering her eyes, nose and
> mouth, then punched her near her eye and choked her until she passed out.  The victim
> regained consciousness, but [Peck] punched her in the face several times and hit her with
> a bat until she lost consciousness again.

---

[1]      Joe A. Lizarraga, Warden, Mule Creek State Prison, is substituted for Fred Foulk, former Warden, High Desert State Prison.  FED. R. CIV. P. 25(c).

-1-

When the victim woke up, she had no clothes on and [Peck] was chaining her to a piece of furniture in the garage. [Peck] told the victim he was going somewhere. After some time passed, the victim attempted to escape, but [Peck] was waiting for her when she emerged from the garage and dragged her back in, where he kicked her several times in the rib area and taped her mouth again.

Five or 10 minutes later, [Peck] returned with a glass of water for the victim, then carried her inside the residence and "put [her] in the shower." He then placed her in bed, stating, "Look what you made me do to you." [Peck] gave the victim a cigarette and some pain medication.

The victim was in so much pain that she "couldn't breathe," and [Peck] stated that they might need to call an ambulance. They agreed that if this was necessary, the victim would report that she had fallen out of a tree. [Peck] and the victim went to sleep.

A couple days later, [Peck] left, stating he was going to Los Angeles on a job. The victim left the home the following morning and flagged down a motorist, who called for help.

The victim's injuries included broken ribs, a punctured lung and bruising on her face, extremities and torso. In addition, she had suffered a moderate stroke.

Several days later, sheriff deputies located [Peck] under a freeway with a sleeping bag and various other belongings. Several notes were located in his vehicle, containing instructions for his employer to send his final checks to his father and telling his father that he was leaving the area and that "he wanted to document and explain how [the victim] destroyed his life." In one of the notes, he inquired: "Have I been in the news? Have no more contact with me. I don't want to get you in trouble." [Peck] was interviewed by a sheriff's deputy after his arrest and explained that when he wrote he was "leaving the area," he meant he was "not going to stick around" and that he was "getting out of town." [Peck] told the sheriff's deputy that he had not left town because he would have had to rely on his family and friends to support him and he did not want them to get into trouble or be held accountable.

At trial, evidence was presented regarding the victim's character for untruthfulness, and one witness testified she previously had seen the victim hit [Peck] with a broom.

*People v. Peck*, No. C064458, 2011 WL 2929677, at *1-2 (Cal. Ct. App. July 21, 2011).

A jury found Peck guilty of torture, two counts of corporal injury to a cohabitant, two counts of assault with a deadly weapon or force likely to produce great bodily injury, two counts of false imprisonment, and dissuading a witness. *Id.* at *1. The jury also found true that Peck inflicted great bodily injury involving domestic violence and that he personally used a dangerous or deadly weapon during the commission of several of the offenses. *Id.* In a bifurcated

proceeding, the jury found that Peck had four prior serious felony convictions. *Id.*  The court sentenced Peck to 80 years to life in state prison. *Id.*

Peck appealed through counsel, claiming that the trial court erred in excusing Juror No. 2 during deliberations on his prior convictions and in failing to conduct an adequate hearing on his motion for a mistrial based on juror misconduct. *Id.*  The Court of Appeal affirmed Peck's judgment of conviction in a reasoned opinion on July 21, 2011. *Id.* at *6.  Peck raised the same arguments in his counseled petition for review.  The California Supreme Court summarily denied review on October 19, 2011.

Peck then filed a *pro se* petition for a writ of habeas corpus with the superior court, claiming that his trial counsel was ineffective for failing to: 1) investigate all facts of the case; 2) identify, interview, and call all potential witnesses favorable to the defense; and 3) introduce handwritten letters by the victim which were written prior to the incident.  He further claimed that the trial court erred in denying his *Marsden* motion[2] when he brought to the trial court's attention that trial counsel had deviated from their original plan to call two witnesses and to introduce the victim's handwritten letters into evidence.  On September 17, 2012, the superior court denied habeas relief in a reasoned opinion.  Peck raised the same claims in his petition filed with the Court of Appeal.  The Court of Appeal summarily denied relief on October 11, 2012. Peck again raised the same arguments in his petition filed with the California Supreme Court. That court summarily denied review on May 22, 2013.

---

[2]     *See People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial court to deny a defendant's motion to relieve his court-appointed attorney without holding a hearing to allow the defendant to explain its grounds).

Peck filed his *pro se* Petition for Writ of Habeas Corpus with this Court on June 19, 2013.  Respondent concedes that it is timely and that Peck has exhausted his claims in state court.

## II. GROUNDS RAISED

In his Petition before this Court, Peck argues that: 1) the trial court erroneously denied without a hearing his motion for a mistrial based on juror misconduct; 2) the trial court excused Juror No. 2 without cause; 3) trial counsel was ineffective for failing to adequately investigate three witnesses and for failing to introduce as impeachment evidence handwritten statements made by the victim; and 4) the trial court violated his Sixth Amendment right to counsel by denying his *Marsden* motion.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### Denial of motion for a mistrial without a hearing

Peck first argues that the trial court erroneously denied his motion for a mistrial, in violation of his right to due process and trial by jury, when it rejected his allegations of juror misconduct without conducting a hearing on the matter. According to Peck, the jury misconduct included "improper consideration of a confession that was not introduced into evidence, and a newspaper article reporting on [his] prior convictions." Peck raised this claim on direct appeal, and the Court of Appeal summarized the facts of this claim as follows:

During trial, the court questioned the jurors as to whether any of them had read anything about the case in that morning's newspaper. One of the jurors stated that her husband "read the article" but she had not and her husband knew she did not want to talk about it. The court admonished the jury not to read any articles about the case.

Prior to sentencing, [Peck] filed a motion for new trial, accompanied by declarations from Juror No. 2 and her replacement, the alternate juror. Juror No. 2's declaration stated, in relevant part: "One woman juror said that [Peck] had confessed to the Sheriff Deputies." We note that much of Juror No. 2's declaration addressed her thoughts and feelings during deliberations and her beliefs as to the thought processes of the other jurors. Such evidence is not admissible when inquiring into the validity of a verdict. (Evid. Code, § 1150, subd. (a).)

The alternate juror's declaration stated, as relevant here: "During our deliberations on the prior convictions, one female juror said[,] 'Wow, this must have been exactly what was in the newspaper that the judge didn't want us to see.' Another juror then asked her, '[D]o you mean the previous case?' The female juror then said verbatim as it was written in the article, the amount of time he was sentenced to on the previous case. She said it exactly how it was written in the news article. I know that the female juror read the article and shared it with other jurors. I could tell because it was discussed in the jury room, and I did not think it was right. When the case was over, I went home and looked up the article on the internet. The female juror's words in the jury room were verbatim to the article I read on the internet."

The trial court denied [Peck's] motion for a new trial, agreeing with the prosecuting attorney that the jury could have viewed the notes found in [Peck's] vehicle regarding his plan to flee—which were testified to by a sheriff's deputy—as a confession. With regard to [Peck's] contention that the jury had considered a newspaper article about his prior convictions, the court found that the information contained in the alternate juror's declaration did not "necessarily mean[ ] that [the jury] read something in the paper," as it had been given certified copies of [Peck's] prior convictions that contained the same information.

*Peck*, 2011 WL 2929677, at *4-5.

The Court of Appeal ultimately denied Peck relief on this claim:

Juror misconduct occurs when a juror receives evidence from a source other than the courtroom, even if received inadvertently. (§ 1181, subd. 2; *People v. Zapien* (1993) 4 Cal. 4th 929, 994.) "[W]here a verdict is attacked for juror taint, the focus is on whether there is any *overt* event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation], which suggests a *likelihood* that one or more members of the jury were influenced by improper bias." (*In re Hamilton* (1999) 20 Cal. 4th 273, 294.)

A juror's exposure to information extraneous to the evidence presented at trial "'may require . . . examination for probable prejudice.'" (*People v. Harris* (2008) 43 Cal. 4th 1269, 1303.) "A court may hold an evidentiary hearing when jury misconduct is

alleged in a new trial motion, but the court may also, in its discretion, conclude that a hearing is not necessary 'to resolve material, disputed issues of fact.'" (*People v. San Nicolas* (2004) 34 Cal. 4th 614, 649.) "'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.'" (*People v. Avila* (2006) 38 Cal. 4th 491, 604.) The decision on whether to hold an evidentiary hearing "is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." (*People v. Hayes* (1999) 21 Cal. 4th 1211, 1260-1261.)

[Peck] maintains the trial court did not hold an adequate hearing into his allegations of juror misconduct because it failed "to question the other jurors to determine whether they were influenced by the alleged confession and newspaper article." But implicit in the court's findings was a determination that there was insufficient evidence of juror misconduct in the juror declarations to warrant an evidentiary hearing. We discern no abuse of discretion in this regard.

As found by the trial court, Juror No. 2's statement regarding another juror's mention of [Peck's] "confess[ion] to the Sheriff Deputies" was consistent with evidence received at trial. A sheriff's deputy testified about notes found in [Peck's] vehicle discussing his plan to flee and about her questioning [Peck] regarding the notes. [Peck] admitted to the sheriff's deputy that he wrote the notes and clarified that when he stated he was leaving the area, he meant he "was not going to stick around" and that he was "getting out of town."

The deputy district attorney's first comments to the jury during argument concerned [Peck's] statement to the deputy sheriff about his intent to flee, and he returned to this evidence later in his argument. The jury was instructed that evidence [Peck] fled or tried to flee immediately after the crime may show that he was aware of his guilt. In light of the paucity of information in Juror No. 2's declaration to indicate that extraneous information about [Peck's] confession was received by any of the jurors, the trial court acted well within its discretion in declining to hold an evidentiary hearing on this basis.

We reach a similar conclusion regarding the alleged reference during deliberations on [Peck's] prior convictions to a newspaper article containing information about the priors. The alternate juror quoted the offending juror as stating: "[T]his must have been exactly what was in the newspaper that the judge didn't want us to see." Contrary to [Peck's] claim, this statement implies that the juror had *not* seen the article. Although the alternate juror claims this juror stated "verbatim as it was written in the [newspaper] article, the amount of time [Peck] was sentenced to on the previous case," the jurors had just received evidence on this issue. The alternate juror's declaration was devoid of any specific information to suggest the jurors received this information from an improper source. Similarly vague was the alternate's statement that she "could tell" the other juror read the article and shared it with the other jurors "because it was discussed in

-7-

the jury room."  The trial court was entitled to find insufficient evidence of juror misconduct to warrant an evidentiary hearing on this basis as well.

*Id.* at *5-6.

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana,* 379 U.S. 466, 472-73 (1965); *see also Estrada v. Scribner,* 512 F.3d 1227, 1238 (9th Cir. 2008) ("The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial." (citing *Jeffries v. Wood,* 114 F.3d 1484, 1490 (9th Cir. 1997) (en banc), *overruled on other grounds by Gonzalez v. Arizona,* 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc))).  Thus, the Ninth Circuit has "consistently recognized that the Sixth Amendment prohibits jurors from introducing matters into the deliberations not present during the trial."  *Fields v. Brown*, 503 F.3d 755, 793 (9th Cir. 2007); *see Gibson v. Clanon,* 633 F.2d 851, 854 (9th Cir. 1980) (explaining that  a jury's consideration of extrinsic material is a constitutional violation).  There is a potential for prejudice when a juror "interjects into deliberations 'objective extrinsic facts' regarding the accused because that juror becomes an unsworn witness who is not subject to either confrontation or cross-examination." *Mancuso v. Olivarez*, 292 F.3d 939, 950 (9th Cir. 2002) (citation omitted).  No bright line exists for determining whether a petitioner has suffered prejudice from juror misconduct; therefore, reviewing courts "place great weight on the nature of the extraneous information that has been introduced into deliberations."  *Id*. (citation omitted).  "The inquiry into a jury's consideration of extrinsic evidence does not end at whether

misconduct occurred; upon a finding of misconduct, a *rebuttable* presumption of prejudice applies." *Tong Xiong v. Felker*, 681 F.3d 1067, 1077 (9th Cir. 2012).

In the case of an allegation of juror misconduct, "a post-trial hearing is adequate to discover whether [the defendant] was prejudiced" by that alleged misconduct. *Rushen v. Spain,* 464 U.S. 114, 119 at n.3 (1983); *see also Smith v. Phillips,* 455 U.S. 209, 218 (1982) (upholding post-trial hearing as an adequate remedy to determine prejudicial effect of juror misconduct). However, such a hearing is not constitutionally required unless a sufficiently strong showing of misconduct has been made. *See generally Tanner v. United States,* 483 U.S. 107, 126 (1987). This standard recognizes that a criminal defendant's Sixth Amendment interests are already adequately protected by several aspects of the trial process, including voir dire, observation during trial by the court, counsel, and courtroom personnel, and observation by fellow jurors. *Id.* at 127.

Thus, clearly established Supreme Court precedent does "not stand for the proposition that *any time* evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias." *Sims v. Rowland,* 414 F.3d 1148, 1155 (9th Cir. 2005). Rather, Supreme Court precedent "provide[s] a 'flexible rule.'" *Id.* The Ninth Circuit held that this "elasticity" is reflected in its own cases interpreting the Due Process Clause, which uniformly hold that

> a federal court is not required to hold a hearing in order to comply with due process, but should "consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source" when determining whether a hearing is required.

*Id.* (citation omitted).

Accordingly, due process "forbids a trial judge from remaining idle in the face of evidence" indicating probable juror bias or misconduct, but there is no bright-line rule requiring a full-fledged hearing in every case. *Id*. at 1156.

Consistent with this "flexible rule," the Court of Appeal reasonably concluded that the trial court did not abuse its discretion in denying without a hearing Peck's motion for a new trial based on juror misconduct. In her declaration in support of Peck's motion for a mistrial, Juror No. 2, who participated in the guilt phase of the trial but not in the sentencing phase, stated that a fellow juror told her that "Peck had confessed to the Sheriff Deputies," which "made [her] feel better about voting guilty." This claim, however, may not be considered by this Court in determining whether there was juror misconduct. "Juror testimony about consideration of extrinsic evidence may be considered by a reviewing court, but juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not." *Fields*, 503 F.3d at 778; *see Sassounian v. Roe*, 230 F.3d 1097, 1108-09 (9th Cir. 2000) (discussing "[a] long line of precedent distinguish[ing] between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effective of evidence on the particular juror, which may not"); *United States v. Bagnariol*, 665 F.2d 877, 884-85 (9th Cir. 1981) ("Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts."); FED. R. EVID. 606(b).

In any event, as the trial court noted, it is likely that the juror who allegedly told Juror

No. 2 that Peck had confessed had drawn that conclusion from evidence introduced at trial.[3]

Sheriff's Deputy Karen Sangster described her pre-arrest conversation with Peck, wherein he

admitted his intent to flee.  Peck also wrote several notes, which were found in his vehicle,

asking that his employer send his final checks to his father, and telling his father that he was

leaving the area and to retrieve his van.  Peck "wanted to get his affairs in order before he went,

and he wanted to document and explain how [the victim] destroyed his life."  Peck specifically

asked in one letter, "Have I been in the news?  Have no more contact with me.  I don't want to

get you in trouble."  The jury was instructed that it could consider those statements in reaching a

verdict and that Peck's flight or attempted flight may be considered consciousness of guilt.  It

would not have been unreasonable under the circumstances for the juror to construe Peck's

statements and attempt to flee as an admission that he played a role in the charged crimes.

Finally, Juror No. 2's observation that another juror's husband stated that information about

Peck could be found online is innocuous as Juror No. 2 did not assert that the juror looked up the

information herself or shared it during deliberations.

The alternate juror's declaration also does not support Peck's contention that the jury

improperly considered extrinsic evidence in deliberating on his prior convictions.  According to

the alternate, during the bifurcated proceeding on the prior convictions, another juror exclaimed

that the information they had just received about Peck's convictions "must have been exactly

---

[3]    Peck had apparently confessed, and the trial court denied Peck's pretrial motion to exclude the confession, finding that he knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The prosecution nevertheless declined to introduce his confession at trial.

what was in the newspaper that the judge didn't want us to see."  As the Court of Appeal noted, contrary to Peck's claim, the offending juror's statement implied that she had *not* read the newspaper article, and the alternate juror's declaration was vague with respect to how she "could tell" that the other jurors had read the article.  Moreover, as the trial court observed, the jury had just been presented with Peck's certificates of convictions and the specifics of his prior instances of incarceration, which the newspaper article similarly covered.  The alternate's statement that the jury was discussing the specifics of Peck's criminal history does not necessarily reflect that they all read the news article, but rather that they had just been presented with the details of his prior convictions.  Moreover, any error did not have a substantial and injurious effect on the verdict because Peck had already been found guilty in the prior, bifurcated proceeding.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

In sum, the evidence Peck presented of juror misconduct was largely vague and otherwise explainable by evidence on the record.  Because the court was not presented with probable instances of the consideration of extrinsic evidence, it was not unreasonable to deny Peck's motion for a new trial without a hearing.  Peck therefore cannot prevail on this claim.

Dismissal of Juror No. 2

As already discussed, after the jury found Peck guilty and the jurors were individually polled, they considered, in a bifurcated proceeding, Peck's prior convictions.  During deliberations on the priors, the foreperson sent a note to the trial court stating that Juror No. 2 was "request[ing] to be removed from this phase of the case."  *Peck*, 2011 WL 2929677, at *2.  Juror No. 2 had left the jury room and was "sitting by herself . . . in tears" in the hallway when she was called into the courtroom and questioned.  *Id*.  The following colloquy ensued:

-12-

| | |
|---|---|
| The Court: | What seems to be the difficulty, Juror No. 2? |
| [Juror No. 2]: | I don't feel like I can stay in there and come to a decision with the group of people that are in there. |
| The Court: | Was there anything in particular that was upsetting you? |
| [Juror No. 2]: | Yes, I felt at first that my own - - by what I believe in and what I've seen, that I've come to the conclusion on my own that I've reached a verdict of not guilty, and I let them persuade me into thinking otherwise.<br>I didn't have enough confidence in myself, I believe, and I felt that I - - I feel like if I let them do that to me again, I would just rather not be in there and go through the rest of the phase with them.  It's like a zoo in there.  They're joking around.  They're not taking things serious.  They're talking about other stuff that doesn't even pertain to what's going on with the case, and they're making jokes of how this all turns out, and well, it just doesn't seem fair to me, and I don't want to be any part of it, and I don't want to be any part of putting somebody in prison [for] the rest of their life. |
| The Court: | Well, you don't have anything to do with the punishment. |
| [Juror No. 2]: | That's what they were telling me.  That's what I wasn't understanding that this is a three strikes you're out thing and this is going to be the third strike and that he's going to go to prison forever because that's what he deserves.  They're like, "We were all right.  Look what happened.  We were all right."  Showing the papers that you had just given them, they believe that they have done exactly what was meant to be done because of what his prior record showed, because of his being on parole and such. |

Over a defense objection and motion for a mistrial, the trial court excused Juror No. 2, replaced her with one of the alternates, and instructed the jury to start their deliberations over on the prior allegations.  During a later motion for a mistrial, the trial court noted that Juror No. 2's statements indicated that she was not going to deliberate on the priors or follow the court's instructions.  In his counseled appeal, Peck claimed that the trial court dismissed Juror No. 2 without cause.  The Court of Appeal denied Peck relief:

A trial court may discharge a juror at any time "upon . . . good cause shown" that the juror is "unable to perform his or her duty, or if a juror requests a discharge and good cause appears." ([California Penal Code] § 1089.)

"A juror's duty is to weigh the evidence and credibility of witnesses with impartiality and to reach a fair and unbiased verdict. [Citations.] It is well settled that a sitting juror's actual bias, which would have supported a challenge for cause, renders him 'unable to perform his duty' and thus subject to discharge and substitution. . . . " (*People v. Thomas* (1990) 218 Cal. App. 3d 1477, 1484.) Actual bias is defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code of Civ. Proc., § 225, subd. (b)(1)(C).) "'A juror's inability to perform his or her functions . . . must appear in the record as a "demonstrable reality" and bias may not be presumed.'" (*People v. Beeler* (1995) 9 Cal. 4th 953, 975.)

"A juror's disqualification is discretionary with the court and if there is any substantial evidence supporting the decision it will be upheld on appeal." (*People v. Dell* (1991) 232 Cal. App. 3d 248, 255.) "[T]here is no statutory procedure for determining the existence of a ground of discharge. In the absence of a stipulation by counsel, 'the judge must act on his own motion, expeditiously. His summary determination on the basis of any evidence . . . will seldom be successfully challenged.'" (*Id.* at p. 256, fn. omitted.)

In the present matter, a note from the foreperson stated that Juror No. 2 wanted to be discharged from the jury. Prior to being questioned by the trial court, Juror No. 2 left the jury room, demonstrating her unwillingness to deliberate further. When questioned, she informed the court she did not think she could stay in the jury room with the other jurors and she did not "want to be any part of putting somebody in prison the rest of their life." Even when the court explained to her that she did not "have anything to do with the punishment," the juror persisted that she had not understood it was a three strikes case and defendant was "going to go to prison forever." These statements and actions by Juror No. 2 evinced an inability to deliberate with the other jurors, to follow the law, and to remain impartial. In other words, she was unable and unwilling to perform her duties as a juror. Furthermore, Juror No. 2 had requested to be discharged on this basis. The trial court did not abuse its discretion by discharging this juror.

[Peck] maintains that "Juror No. 2's reference to punishment, read in context, simply reinforces the conclusion that she did not want to deliberate *on a case involving a life sentence* with jurors who refused to take the process seriously." But none of Juror No. 2's complaints about the jury at the time she was discharged amounted to misconduct. Thus, regardless of what the reason was that Juror No. 2 was refusing to deliberate with the other jurors, such refusal constituted good cause for discharging her.

[Peck] claims the trial court did not adequately question Juror No. 2 to determine whether she could be impartial despite the difficulties she was having. But there was nothing equivocal about Juror No. 2's statements and nothing to suggest that further questioning could restore her impartiality or her willingness to deliberate with the other jurors.

-14-

[Peck] also claims that, by removing Juror No. 2 when her remarks conveyed she favored [his] position, the trial court sent the jury a message to "vote for conviction." [Peck] analogizes the situation to that in which a deadlocked jury is instructed in a manner suggesting that the minority jurors should give further consideration to the position of the majority. (*See People v. Gainer* (1977) 19 Cal. 3d 835, 845.)  However, the reason such instructions are impermissible is that they direct jurors to consider an extraneous factor in their deliberations—the position of the majority—as well as putting excessive pressure on dissenting jurors to acquiesce to the majority position. (*Id.* at pp. 848, 850.)  Here, on the other hand, Juror No. 2 was not removed because she "favor[ed] one side or the other," as suggested by [Peck]. Her discharge resulted when she removed herself from the jury room and made comments indicating that she would be unable to disregard punishment in reaching a verdict.   Accordingly, we reject this argument as well.

*Peck*, 2011 WL 2929677, at *3-4.

Criminal defendants in state trials have a right to a fair and impartial jury under the Sixth and Fourteenth Amendments.  *Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  The "essential feature" of a jury consists of "the interposition between the accused and his accuser of the commonsense judgment of a group of laymen." *Williams v. Florida*, 399 U.S. 78, 100 (1970).  The Ninth Circuit has found constitutionally valid the procedure used in California criminal trials to substitute for good cause an alternate juror for a regular juror under Penal Code § 1089.[4]  *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985), *amended on other grounds by Miller v. Stagner*, 768 F.2d 1090 (9th Cir. 1985) ("The California

---

[4]      That section provides in relevant part:

        If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

CAL. PENAL CODE § 1089.

substitution feature followed by the trial court [under § 1089] preserved the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments." (quoting *Williams*, 399 U.S. at 100)).

To the extent that Peck contends that the trial judge abused his discretion under state law to dismiss the juror, such a contention is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Accordingly, the only question raised by a federal habeas claim challenging a trial court's application of § 1089 in a particular case is whether the removal of the juror violated the Sixth Amendment, which depends on whether there was good cause for the removal.  *See Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997) (noting that because *Miller* found that § 1089 was constitutional on its face, the sole inquiry was whether the substitution violated petitioner's Sixth Amendment rights in light of the trial court's finding of good cause).  Review of the state court's findings regarding a juror's fitness in this regard is entitled to "special deference."  *Id.* at 1426 (citing *Patton v. Yount*, 467 U.S. 1025, 1036-38 & n.12 (1984)).

Substantial evidence supports the trial court's conclusion that good cause existed for dismissing Juror No. 2.  Juror No. 2 stated that she wanted to be removed from the jury and had left  the jury room.  When the court inquired as to what was wrong after she was found crying in the hallway, Juror No. 2 indicated that she no longer wanted to sit on the jury and that she could not continue to deliberate, even though the court and other members of the jury assured her that she did not have a role in sentencing Peck.  The trial court was in the best position to observe Juror No. 2's demeanor and emotional state and to determine her ability to continue deliberating.  Appellate courts have upheld the dismissal of jurors whose physical or mental condition prevents

them from effectively participating in deliberations, *see Perez*, 119 F.3d at 1427 (collecting

cases), as well as jurors who refuse to deliberate, *Williams*, 646 F.3d at 648, and accordingly the

trial court properly removed Juror No. 2, as she was no longer able to perform the essential

functions of a juror.   Moreover, Peck cannot establish a constitutional violation because "there

are no Supreme Court holdings addressing the issue of whether a trial court's discharge of a juror

for refusing to deliberate violates the Sixth Amendment."  *Murphy v. Lamarque*, 264 F. App'x

554, 555 (9th Cir. 2008).

Ineffective assistance of counsel and the denial of substitute counsel

Peck next argues that his trial counsel was ineffective for failing to call three witnesses

and for failing to introduce handwritten statements made by the victim prior to the incident as

impeachment evidence.  Peck raised these complaints in the October 30, 2009, *Marsden* hearing,

which was denied by the trial court.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a

reasonable probability that the outcome might have been different as a result of a legal error, the

defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376,

1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

393-95.  Thus, Peck must show that defense counsel's representation was not within the range of

competence demanded of attorneys in criminal cases, and that there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

1.      Failure to call Lucille McBarron to testify

Peck first argues that his trial counsel was ineffective for failing to call Lucille McBarron, the victim's mother, to testify.  Peck argues that McBarron would testify that he called her before he left the victim alone in the trailer, that the victim lied about him to the police in the past which lead to unjustified arrests, and that he was always "the perfect gentleman."  In a letter to defense counsel, the defense investigator stated that she was able to contact McBarron via telephone.  McBarron told her that the victim had no mental health issues prior to the

-18-

incident and that the victim was not in therapy or on medication.  McBarron stated that she did

not know Peck, but that "[h]e's not much of a man to do what he did to my daughter.  Nobody

deserves that."  According to McBarron, Peck did not contact her to see if the victim could come

and stay with her.  At that point, another female took the phone from McBarron and told the

investigator that McBarron no longer wanted to speak with her, then hung up.  At the *Marsden*

hearing, defense counsel explained that he was not planning on calling McBarron because she

hung up on the defense investigator stating that she no longer wanted to discuss the case, and

because "Peck believes that if I simply call Ms. McBarron to testify that she will testify to things

that I don't know whether she will testify to them or not."  Peck argued in his habeas petition to

the superior court that trial counsel was ineffective for failing to call McBarron to testify, but the

superior court denied relief, concluding that "McBarron did not have information that would

assist the defense."

      The ultimate decision of whether to call witnesses to testify is well within counsel's "full

authority to manage the conduct of the [proceeding]."  *Taylor v. Illinois*, 484 U.S. 400, 418

(1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must

accept the consequences of the lawyer's decision . . . to decide not to put certain witnesses on the

stand . . . .").  Peck has failed to overcome the strong presumption that trial counsel's conduct

fell within the wide range of reasonable professional assistance because he cannot show that trial

counsel's failure to call the McBarron was anything but a tactical decision that this Court cannot

second-guess.  *See, e.g., Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a

lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at

trial.").  McBarron told the investigator that the victim did not have any mental health issues

prior to the incident, that she did not know Peck, that Peck did not contact her to see if the victim could move in with her, and that she did not wish to speak to the investigator.  Based on the information provided to the investigator, McBarron did not have any information that would assist the defense, and counsel reasonably decided that it would not be beneficial to call her to testify.  Peck therefore cannot prevail on his claim that trial counsel was ineffective for failing to call McBarron.

2.      Failure to locate and call Marjorie Tremain

Peck next argues that trial counsel was ineffective in failing to call Marjorie Tremain, a woman who visited Peck and the victim during the time the victim alleged that Peck was holding her under duress.  According to the police report, Tremain had known Peck for approximately four months when she was picked up by Peck and taken to his home.  Peck introduced Tremain to the victim, who was lying on Peck's bed and watching TV.  Peck told Tremain that the victim was staying with him and recuperating from injuries sustained from falling off his truck. Tremain told the police that the victim had a black eye and that her face and legs were "all bruised up."  The victim did not ask Tremain for help or to be taken to the hospital. *Id*.  Tremain told the police that Peck informed her that he was leaving and asked her to check on the victim and make food for her.  Peck claims that Tremain would have testified that when she visited the victim, the victim was "sitting up in bed without a care in the world" and that she was not actually in fear of her safety.

At the *Marsden* hearing, defense counsel agreed with Peck that "Tremain might be an important witness," but stated that the defense investigator could not find her.  Tremain was homeless and the defense investigator had made multiple unsuccessful attempts to locate her.

Defense counsel stated that he was continuing his efforts to locate Tremain, and that he would indeed subpoena her if she was located before the end of trial.  However, Tremain had told another individual after the incident that she "didn't want to get involved and saw nothing."

Peck argued in his habeas petition to the superior court that trial counsel was ineffective for failing to call Tremain, but the superior court denied him relief, concluding that Peck failed to demonstrate that counsel's decision not to subpoena her was anything other than a trial tactic, and that he failed to demonstrate prejudice in any event.

Counsel cannot be faulted for failing to subpoena a witness he could not locate after diligent efforts to do so.  Although Peck suggests those efforts were inadequate, he attached to his Petition a declaration from an individual who states that, although she saw Tremain once after the incident, she had not seen her since despite efforts to locate her.  It is not clear what else counsel could have done to locate a homeless witness who wanted nothing to do with the case. In any event, Peck was not prejudiced by the failure to locate and call Tremain.  Tremain maintained that she "saw nothing" and did not want to be involved.  And although she did speak to the police after the incident, she told the police that the victim had a black eye and was bruised all over her body, which would have incriminated Peck.  It is not likely under these circumstances that Tremain would have provided testimony helpful to the defense, and again, Peck has failed to establish that counsel was ineffective in this manner.

3.      Failure to call Rick Ware

Peck also faults counsel for failing to call Rick Ware, his parole officer.  He claims that Ware was an "invaluable percipient witness" because he was aware of the tumultuous relationship between Peck and the victim and would have testified that he previously instructed

Peck to stay away from the victim because she was "trouble."  Peck also claims that Ware would

have testified that the victim had caused him to be arrested on false charges on two prior

occasions and that the victim called Ware on multiple occasions to "get [him] into trouble."  He

also claims that Ware would testify that, although he had missed a parole appointment on the

afternoon the victim was found, he did so because his truck ran out of gas, and, moreover, he

later changed his mind about fleeing and turned around so as not to be in violation of his parole.

Peck did not mention Ware in the *Marsden* hearing, so there is no record of why trial counsel

elected not to call him.  Peck argued in his habeas petition that counsel was deficient for failing

to call Ware, but the court denied him relief, stating generally that Peck had failed to establish

that counsel's actions were anything other than trial strategy and that Peck was not prejudiced in

any event.

   Peck cannot prevail on this claim because he has failed to provide an affidavit from Ware

stating that he would, in fact, provide testimony helpful to the defense.  *See Dows v. Wood,* 211

F.3d 480, 486 (9th Cir. 2000) (denying ineffective assistance of counsel claim on habeas review

based on lack of preparation for failure to call witnesses when no affidavits were submitted to

support petitioner's assertion as to what testimony would have been provided).  Even a *pro se*

petitioner must provide specific facts, rather than just conclusory assertions, to show a

"reasonable probability" that the inclusion of the omitted testimony would have made a

difference at trial.  S*trickland*, 466 U.S. at 694; *Licon v. Marshall*, 293 F. App'x 468, 470 (9th

Cir. 2008).  Peck has not done so, and accordingly cannot prevail on this claim.  In any event, it

appears that Ware's testimony might have been damaging to the defense.  The victim escaped

from Peck's trailer around 6:30 a.m. on July 1, 2009.  By noon of the same day, the responding

sheriff deputies contacted Ware, and Ware, at their urging, contacted Peck to schedule a parole appointment for 2 p.m. the same afternoon.  Peck missed that appointment in his attempt to flee, which again, the jury was instructed may be evidence of consciousness of guilt.  There is thus no evidence that Ware's testimony was helpful to the defense, and Peck has failed to establish that his trial counsel was ineffective for failing to call Ware.

   4.  Letters from the victim

   Peck also asserts that trial counsel was ineffective for failing to introduce into evidence an "affidavit of truth" allegedly prepared by the victim in January of 2009.  In that affidavit, the victim recants two claims which resulted in Peck being jailed in 2008.  The victim claimed that she falsely accused Peck because she had "psychological issues" and she "was out for revenge." She claimed that Peck never acted violently toward her and that she "didn't deserve" Peck.  She included in the affidavit several other notes that she had written on previous occasions.  One addressed to Peck in January of 2007 states that she wrote his probation officer a letter and that she would do what she could to help him, and that she "didn't want this to happen."  In an undated note to Ware, the victim stated that Peck "does not deserve to be where he is at." Without elaborating, she claimed that they had been arguing and that she "pushed [Peck] over the limit."  According to the victim, Peck was "a good man" whom she "did not deserve." Neither the affidavit of truth nor the attached notes addressed the July 1, 2009, arrest for the instant offenses.

   At the *Marsden* hearing, defense counsel stated that he was not planning on introducing the affidavit because it was drafted in January of 2009, before Peck's arrest for the instant offenses, and "not knowing what [the victim was] going to say," he did not "want to give her the

opportunity" to claim that she had been "somehow forced . . . or . . . made to write the affidavit."
Counsel added that "since it was written nearly a year after the events [for which Peck was
previously arrested] . . . it would be simple for her to say that . . . she wrote this at Mr. Peck's
request, or . . . as some sort of threat or something."  Peck countered that the affidavit and
attached notes would support his claim that the victim had him falsely arrested for the instant
offenses.  The superior court denied habeas relief on this claim, concluding that Peck failed to
demonstrate that counsel's decision was anything other than a trial tactic.

      The superior court reasonably rejected Peck's claim that counsel was ineffective for
declining to introduce these documents.  Trial counsel made clear in the *Marsden* hearing that he
declined to introduce these letters out of concern that the victim might claim that she was forced
or threatened to recant her previous claims, and this court may not second-guess counsel's
tactical decisions.  The notes would have also revealed that Peck had been arrested on two
previous occasions for domestic violence against the victim, which undermined the defense's
claim that someone else must have assaulted the victim.  It was thus a reasonable tactical
decision for trial counsel to decline to impeach the victim with these letters, and Peck cannot
prevail on this aspect of his ineffective assistance of counsel claim either.

Denial of *Marsden* motion

      The trial court ultimately denied Peck's *Marsden* claims, concluding that Peck and his
counsel were "having a difference [of opinion as to trial] strategy," and advised Peck to "leave it
up to [defense counsel] to determine strategy.  He's been a felony deputy for years in the public
defender's office.  He does a good job."  Peck renewed his request for substitute counsel at
sentencing, which the trial court denied, noting that Peck could raise his ineffective assistance of

counsel claims on appeal and through a petition for writ of habeas corpus.  Peck now argues that

his Sixth Amendment right to counsel was structurally violated when counsel declined to call the

above-mentioned witnesses or introduce the affidavit from the victim.  He raised this claim in his

petition for habeas relief to the superior court, which denied him relief, concluding that Peck had

failed to establish that he and appointed counsel became embroiled in such an irreconcilable

conflict that ineffective representation was likely to result.

The Sixth Amendment right to counsel guarantees to an accused the concomitant rights to

conflict-free representation and the effective assistance of counsel.  *See Wheat v. United States*,

486 U.S. 153, 156 (1988); *Strickland*, 466 U.S. at 686.  These rights may be infringed if an

accused and his counsel become embroiled in an "irreconcilable conflict."  *See Stenson v.*

*Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("[F]orcing a defendant to go to trial with an

attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth

Amendment right to counsel." (citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970)

("[T]o compel one charged with [a] grievous crime to undergo a trial with the assistance of an

attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the

effective assistance of any counsel whatsoever.")); *see also Daniels v. Woodford*, 428 F.3d 1181,

1197 (9th Cir. 2005).

However, "not every conflict or disagreement between the defendant and counsel

implicates Sixth Amendment rights."  *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en

banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)).  The Sixth Amendment does not

require or guarantee, implicitly or otherwise, that an attorney-client relationship be "meaningful"

or free of discord.  *Morris*, 461 U.S. at 13-14; *see Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th

Cir. 2008) (en banc) ("[Petitioner] has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts, but with whom the defendant refuses to cooperate because of dislike or distrust.").  Rather, an asserted conflict crosses the constitutional threshold "only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel." *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also Daniels*, 428 F.3d at 1197 (the nature and extent of the conflict must be such as to "deprive[] the defendant of representation guaranteed by the Sixth Amendment." (citing *Schell*, 218 F.3d at 1027)).  Denial of a *Marsden* motion to relieve and/or substitute appointed counsel may implicate these Sixth Amendment concerns. *Schell*, 218 F.3d at 1021 ("Normally, the essence of such a motion is that appointed counsel's representation has in some significant way fallen below the level required by the Sixth Amendment.").

On habeas review, the ultimate constitutional question is whether the state court's disposition of a *Marsden* motion violated the petitioner's right to counsel because the asserted conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Id*. at 1026.  If the Court determines the existence of a conflict so serious that it "resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required," and the "trial shall be presumed to have been unfair." *Id.* at 1027-28 (citing *Strickland*, 466 U.S. at 692).  "If the serious conflict did not rise to the level of a constructive denial of counsel, [the petitioner] would have to prove he was prejudiced by the conflict." *Id*. at 1028.

The Ninth Circuit has identified three factors guiding the reviewing court's determination of whether a conflict with counsel was "irreconcilable" such that the substitution of counsel was constitutionally required. Foremost, the court should consider the nature and extent of the conflict; namely, the cause of the conflict and the circumstances in which it developed, and whether the defendant had legitimate reasons for the loss of confidence in his counsel. *See id.* at 1026-27 (the reviewing court should determine how far the attorney-client relationship had deteriorated and whether any conflict was of the defendant's "own making" or arose from decisions properly left to counsel). In this regard, "[d]isagreements over strategical or tactical decisions do not rise to [the] level of a complete breakdown in communication." *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also United States v. McKenna*, 327 F.3d 830, 844 (9th Cir. 2003) (holding that a dispute with respect to trial tactics "is not a sufficient conflict to warrant substitution of counsel"); *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) ("[A]ppointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense."). The court should also consider the adequacy of the inquiry and the timeliness of the motion to substitute counsel. *Stenson*, 504 F.3d at 886; *Schell*, 218 F.3d at 1024-25. Particularly, the court should examine whether the inquiry undertaken by the trial court was "such [as] necessary . . . [to] ease the defendant's dissatisfaction, distrust and concern" and whether the inquiry conducted "provide[d] a sufficient basis for reaching an informed decision . . . regarding whether to appoint new counsel." *Stenson*, 504 F.3d at 886 (citations, internal brackets, and quotation marks omitted); *see also Schell*, 218 F.3d at 1025.

The superior court's conclusion that Peck failed to establish that the substitution of appointed counsel was warranted was not unreasonable. Peck's complaints—that counsel failed

to call several witnesses or impeach the victim with notes she had written recanting earlier claims of abuse—amounted to disagreements over trial strategy, as Peck himself acknowledged during the *Marsden* hearing.  There is no evidence that Peck and trial counsel had a complete breakdown in communication amounting to the ineffective assistance of counsel.  He therefore is not entitled to relief on this claim.

V. CONCLUSION AND ORDER

Peck is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 15, 2014.

/s/James K. Singleton, Jr.<br>JAMES K. SINGLETON, JR.<br>Senior United States District Judge